## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DANN MCINNIS,                          :
       Plaintiff,              :
                     :
V.                                     :        Civil No. 3:03CV1803(JBA)
                     :
TOWN OF WESTON AND                     :
ANTHONY LAND,                          :
       Defendants.             :

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. #49] AND MOTION TO STRIKE [DOC. #58]

Plaintiff Dann McInnis, a police officer, brings an age discrimination lawsuit against the Town of Weston and Anthony Land, its Chief of Police, claiming unlawful failure to promote and retaliation. See Complaint [doc. #1]. He alleges violations of the Age Discrimination in Employment Act of 1969 (ADEA), 29 U.S.C. § 621 et seq., the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-51 et seq., and the Equal Protection Clause of the Fourteenth Amendment. He seeks back pay, front pay, liquidated damages, compensatory and punitive damages, injunctive relief, attorney's fees, and costs. Defendants have moved for summary judgment on all claims. See Def. Mot. for Summary Judgment [doc. #49]. For the reasons discussed below, defendants' motion will be granted as to the Equal Protection claim and denied as to the remaining claims.

### I.    FACTUAL BACKGROUND

McInnis was hired as a patrolman for the Town of Weston in 1984 has held that position ever since. He was born August 10,

1960 and was 42 at the time of the alleged unlawful actions.
Plaintiff's claims stem from the Town's denial of his promotion
to the rank of sergeant after an exam administered in August
2002.  Patrick Daubert, born December 8, 1965 and age 36 at the
time, was promoted instead.  Daubert had seven years experience
while McInnis had eighteen.

**A.   The 2002 Promotional Process**

The promotion examination consisted of a written portion and
an oral portion, each of which counted for half of the total
score, with another one-quarter point added for each year of
experience on the Weston police force. The collective bargaining
agreement in place allowed the Town of Weston to consider the
candidates with the three highest scores for promotion.

On the 2002 test McInnis had the second-highest written
score of 83, behind Officers Filush and Troxell, both over age
40, who scored 85.  Pl. Index [doc. #54-3] Ex. 10.  Daubert
scored 79, which placed him fifth out of seven applicants.  On
the oral portion of the test, however, Daubert scored 96.33,
compared to McInnis's score of 71.48.  Id. Ex. 11.  The four
other officers who took the oral exam, all of whom were over 40,
also scored between 71 and 77 on the oral test.[1]  Id.  As a

---

[1]These were officers Filush, Troxell, Palmieri and
Filsinger.  Officer Ward, the only officer under 40 seeking
promotion other than Daubert, failed the written exam and
therefore did not progress to the oral portion.

result, Daubert had the highest total score of 89.42, while McInnis ultimately ranked in third place with a score of 81.74.

McInnis contends that Defendant Land manipulated the oral portion of the test to prevent McInnis from being promoted, because Land "had an agenda to get rid of the older officers in the Weston Police Department... ." Pl. Mem. in Opp. [doc. # 54] at 2.  It is undisputed that Land is 56 years old.  Pl. L.R. 56(a)(2) Stmt. [doc. #55] ¶ 29.

In support of his claim that Land manipulated the oral exam, McInnis points to Land's testimony that 2002 was the first time that he had ever sat in on an oral examination for sergeant promotion; that Land himself selected the three members of the oral examination panel;[2] and that in a letter to the panel in advance of the interviews, Land requested that the members arrive early so "we will have time to select questions, [and] review scoring ...."  Land Dep., Pl. Index, Ex. 4, 207, 225; Def. Ex. S. Captain Reeves, a member of the panel, confirmed that "[i]mmediately prior to the examination, Chief Land" and the panelists "met and decided which questions to use, who would ask which questions and who would give the introduction..."  Def. Ex. U, ¶ 9.  Reeves affirmed that "[a]t no time did Chief Land speak

---

[2]They were Commander Rich Vibberts of the East Hartford Police Department, Assistant Chief Mark Grecco of the Orange Police Department, and Captain Pat Reeves of the Manchester Police Department.  Def. Ex. R.

about the individual candidates or voice his opinion as to who should get the position," id. at ¶ 11, and that "[e]ach panelist scored each candidate individually." Id. at ¶ 12.  Land stated that he has "no first hand knowledge of the panel's decision-making process" in 2002.  Land Aff., Def. Ex. C, ¶ 9.  He further stated in an affidavit that he "left the room when the candidates were being scored by the panel and did not return to the room until the scoring was complete. ... [He] took no part in the panel's scoring or the calculation of the scoring other than to review the scores to make sure [there] were no line discrepancies." Id. at ¶¶ 11-12.  However, plaintiff points to Land's deposition testimony that he and the panelists together participated in "an adjustment of scores" after the exam so the panelists could change scores that were "out of line with" the others.  Land Dep. at 215.

McInnis also asserts that Land manipulated the oral examination by deciding in 2002, for the first time, that the individual promoted would specifically be assigned to the job of "Staff/Support Sergeant," and by instructing the panelists to ask "technology-based questions" geared toward that position. McInnis Dep. at 108.  McInnis testified that "in the past there has never been a promotion for a specific position within the sergeants.  You'd have an operation, an investigative and a staff and support.  And it was always a promotion to the level of

4

sergeant, and then someone would get assigned or reassigned to an open position." Id.

The job description of the Staff/Support Sergeant included overseeing Emergency 911 communications, supervising the computer system and maintaining computer equipment, and maintaining and purchasing office equipment. Def. Ex. S at 1242-43. Land agreed that he "gave [the panelists] the job description ... and ... told them to ask questions that were appropriate to that position." Land Dep. at 219. He also agreed that this was the first time that a sergeant was hired into a specific position such as oversight of the department's technology. Id. at 222. In response to a question whether he notified the candidates that they were specifically interviewing for the Staff/Support position, he responded only that "[t]hey all knew that that was the vacant position. It was common knowledge in the police department." Id.

McInnis testified that before the exam Officer Daubert, who received the promotion, already "was involved in technology" because he was given special assignments and training in this area, which McInnis "was never given the opportunity to attend." Id. Land denied giving Daubert special technology assignments in advance of the exam, but rather stated that Daubert volunteered for those jobs, including working on the department's radio system and computer network. Id. at 222-23; see also Land Aff. ¶

5

21 ("I have not assigned Sgt. Daubert to any specialized computerized training."). Land testified that although Daubert had studied the computer system of the Orange Police Department, where oral exam panelist Mark Grecco worked, Daubert had done that on his own initiative and had never met Grecco before the exam. Land Dep. at 224-25, 228. Land stated that he discusses training opportunities with the department's training officer, Sgt. Mooney, who then assigns the training courses, and he does not "take into consideration the officer's age when considering training opportunities," Land Aff. ¶ 20. Land did not deny that McInnis was not given technology training opportunities similar to Daubert's.

**B.   Affidavit of Roy Hill**

In further support of his allegation that Land manipulated the 2002 oral exam, Plaintiff adduced evidence from Roy Hill, a former Weston police officer, who said that Land had a history of manipulating the promotion system in favor of younger employees.[3] Hill began as a Weston police officer in 1975 and was promoted to sergeant in 1990, at age 38. Hill Aff., Pl. Ex. 1, at ¶¶ 3-4. He resigned in 2001. Id. at ¶ 3. Hill stated:

> 5. During the promotional process [in 1990], another officer, Bruce Turner, had also applied for the sergeant position and had actually scored higher on the

---

[3]Defendants have moved to strike Hill's affidavit [doc. #58]. As discussed infra n. 8, the motion will be granted in part and denied in part.

promotional exam than I.  Turner was approximately 40
or 41 years old. ... I ... was selected for promotion.

6.  Soon after my promotion, Land confided to me that
he wanted to 'build [his] own department' and did not
want the officers from the prior administration to be
part of his new department.  These veteran officers who
he was referring to were for the most part, in their
mid 40s.
...

10. [In subsequent promotional exams] Land participated
in the oral examination process of new hires by
strongly suggesting to the oral panelists that they
should rethink their scores regarding a given
candidate.  Land also supplied his opinions regarding
the candidates to the oral panelists.  I knew this as a
result of having personally sat on several oral boards
and having personally received this subtle pressure by
Land.

Id. at ¶¶ 5-6, 10.

With respect to Hill's promotion, Land testified that he did
"convey ... to the police commission" that he thought Hill was
the most qualified applicant in 1990, but he denied saying that
he wanted to build his own department.  Land Dep. at 21-22.

Hill stated that while he was with the Weston Police
Department he "personally observed Land treating the officers in
a very disparate manner.  Those officers he favored, which were
the younger officers, were given very favorable treatment, while
the disfavored officers, who were older, were treated very
unfavorably."  Hill Aff. ¶ 11.  He pointed to several instances--
"a tire slashing incident" and "an underage drinking incident"--
where he (Hill) was asked to investigate McInnis and other over-
40 officers and "found nothing wrong" with their police work.

7

Id. at ¶ 12.  In contrast, Hill stated, when Daubert "improperly handled the vehicle stop of a 16 year old teenager (he ordered the boy out of his car by gun point - told to me by Land and [Sgt.] Ferullo), Land did not request an internal investigation ..."  Id.

Land acknowledged initiating an internal affairs investigation against Officer Palmiero "with respect to a tire-slashing incident" but did not recall the under-age drinking incident.  Land Dep. at 33.  He stated that he did not discipline Daubert for pointing a gun at a 16-year-old stopped for a motor vehicle infraction because he was not aware of the incident until it was mentioned during this litigation.  Id. at 39.  Land stated that there had been two internal affairs investigations concerning Daubert's conduct, one after parents complained that Daubert removed a baseball bat from their teenager's car, and another when parents complained that their son was given a ticket for running a stop sign.  Id. at 54. When asked whether he was "even-handed with discipline," Land responded, "Absolutely." Id. at 38.

### C.   Alleged Age-Biased Comments

Also in support of his claim that Land discriminatorily manipulated the promotional process to favor Daubert, plaintiff submits evidence concerning what he contends were several age-biased comments made by Chief Land over a period of years.  Mark

Harper, an Animal Control Officer for the Town of Weston, submitted an affidavit stating that he "was present at either a Board of Finance or Board of Selectmen meeting within the past five years in which Police Chief Anthony Land was making a presentation ...  During his presentation, Land referred to some members of the Police Department as 'dinosaurs' and also 'the old guys.'"  Harper Aff., Pl. Ex. 15, ¶ 3.  This is corroborated by the deposition testimony of Margaret Mendoza, a dispatcher in Weston, who could not recall the time frame but remembered hearing Land at a public meeting make a "comment that he had a lot of, as he put it, dinosaurs that he had to in a sense get rid of."  Mendoza Dep., Pl. Ex. 14, at 12.  Land denied ever using the word "dinosaur" at a meeting with Weston officials.  Land Dep. at 35.

Louis Goldberg, a former member of the Weston Board of Police Commissioners, testified regarding a comment he heard Land make in front of some members of the Board of Police Commissioners on August 1, 2002.  See Goldberg Aff., Pl. Ex. 7 at ¶ 5.  Prior to the official beginning of a meeting of the Board of Selectmen, a discussion came up regarding morale in the police department, connected to a hazing incident of which McInnis was accused.  According to Goldberg, Land stated that "the way to have a good morale in the department would be to 'get rid of the old guys and hire young ones.'"  Id.; see also Goldberg Dep., Pl.

Ex. 8, at 74.  Goldberg "took [the comment] to mean age" rather than seniority, and believed it was specifically directed at McInnis and Filush.  Goldberg Dep. at 74-75.

Land counters that what he said at that meeting was "the way to cure a hazing problem or harassment problem is discipline the employee, including fire them."  Land Dep. at 20-21. Commissioners Brady, Saltz, and Ottomano stated that they do not recall Land making a comment about the need to "get rid of the old guys."  Def. Ex. N at 11-12; Ex. O at 8; Ex. P.[4]  Goldberg explained that other commissioners may not have remembered the comment because "[m]aybe they forgot and maybe one or two didn't hear.  It was a noisy room."  Id. at 115.  Goldberg testified that he "did go into [his] car after the meeting ... and immediately jotted down the comments that were made."  Id. at 75.

Goldberg also testified concerning a comment Land made to him in the early 1990s regarding two groups of police chiefs, one of which Land called "the old guys" and the others he called "the young Turks."  Goldberg Dep. at 93.  Land acknowledged using that language but stated that his intention was to distinguish between the "progressive chiefs" and the "old-boy network," not to differentiate the groups by age.  Land Dep. at 20-21.

---

[4]Defendants argue that Commissioner Gralnick's testimony was similar, see Def. L.R. 56(a)(1) Stmt. ¶ 18, but have not included the relevant portion of Gralnick's deposition testimony to support their assertion.

Plaintiff asserts that "Land's comment during his deposition also reflects his age bias" because Land referred to every one of the officers under 40 "in age stereotyped terms," Pl. Mem. of Law [doc. #54] at 8, as an "energetic, hard-working young cop."  Land Dep. at 240-41.

### D.  Alleged Retaliation

Almost immediately after Daubert was appointed Sergeant, on October 1, 2002, a dust-up arose between Daubert and McInnis, which precipitated a series of angry letters between McInnis and Chief Land through the month of October.  Pl. Exs. 18, 19; Def. Ex. FF.  Finally, on November 7, 2002, McInnis wrote to Land:

> This letter is to inform you that based on, but not limited to, the recent Sergeants exam, the disciplinary action you've taken against me and the lack of special assignments, I feel I'm being discriminated against based on my age.  As such I'm considering filing a lawsuit for age discrimination.

Pl. Ex. 20.  Plaintiff claims Land then engaged in a number of retaliatory actions, beginning on the day McInnis sent the letter and culminating in disciplinary charges in June and July 2003.

On the date of the letter, Land instituted an investigation into McInnis's conduct during a motor vehicle accident on October 26, 2002.  The letter stated that the "department ha[d] received a complaint that ... [McInnis] failed to deliver professional service to a citizen..."  Letter from Land to McInnis, 11/7/02, Pl. Ex. 21.  Plaintiff states that no citizen complaint was provided during discovery despite several requests.  Pl. Mem. of

11

Law at 11-12.  After a departmental investigation into the issue, Land concluded that "there was clearly no proof that Dann McInnis had done anything wrong. ... [T]here wasn't anything to really discipline him for ... ."  Land Dep. at 104.

On December 4, 2002, McInnis filed a complaint with the Connecticut Commission on Human Rights & Opportunities stating that he was not promoted based on his age, and was retaliated against, and specifying the factual circumstances discussed above.  Def. Ex. CC.

The next month, on January 8, 2003, Land began another Internal Affairs investigation into McInnis and his partner, John Filush, for improperly conducting a strip search of two juvenile females suspected of carrying illegal drugs.  Land Dep. at 60-61. The strip search had been authorized by Sgt. Ferrullo, who Land believed "was given bad information by the two officers" about the applicable state law, which requires written permission from the chief of police--Land--to conduct a strip search.  Id. at 61, 64.  In the end, Land gave Ferrullo an oral instruction not to allow a similar mistake again, and McInnis and Filush did not face any discipline.  Id. at 62.

In May 2003, McInnis sent a memo to Land complaining that Daubert had failed to report for duty while McInnis was

processing the arrest of a drunk driver.[5]  Pl. Ex. 24.  The

letter stated that "department practice has always been that when

a custodial arrest is made and only two officers are working, as

was the case on May 10th, an officer is 'Called In' from the on

coming shift."  Id. at 2.  The letter alleged that Daubert had

not responded to a phone call for backup that evening, and the

next day his shift had been changed from the day shift to the

following evening shift.  McInnis stated that Daubert's lapses

posed a safety concern and requested an investigation.  Land

responded to McInnis's complaint by demanding answers to certain

questions.[6]  Pl. Ex. 25.  McInnis wrote back on May 26, Pl. Ex.

26, and on May 27 Land responded with another letter saying that

he "consider[ed] [McInnis's] answers evasive and a violation of a

direct order."  Pl. Ex. 27.  McInnis wrote another letter, Pl.

Ex. 28, which did not satisfy Land, who imposed a three-day

---

[5]The letter also complained that Officer Troxell had
inappropriately allowed an intoxicated female passenger from the
vehicle to remain in the room during processing.

[6]"1.  Are you saying that Officer Troxell spoke to Sergeant
Daubert and lied to you about it when he said he did not?  If you
are please describe what proof you have that the conversation
took place.
"2.  Are you saying that Officer Troxell changed the "D" [for day
shift] to an "E" [for evening shift] on the work schedule?  If
you are please describe what proof you have.
"3.  Are you saying that Sergeant Daubert changed his schedule
just to avoid helping you with the DUI arrest?  If you are please
describe what proof you have.
"4.  Describe exactly why you were fearful and in what way did
your fear manifest itself?"

suspension without pay between June 23 and June 25 because
McInnis "did not sufficiently answer questions directed to
[him]." Pl. Ex. 29. This suspension was later overturned by the
Board of Police Commissioners, which voted to reimburse McInnis's
"docked pay" on July 1, 2003. See Def. Ex. NN at 2814. After
the board's action, however, Land then suspended McInnis for
eight days between July 8 and July 17 for making "a false and
reckless complaint against Sergeant Daubert and Officer Troxell."
Pl. Ex. 30. Land later reduced the suspension to three days.
Def. Ex. II at 3123.

On July 28, 2003, Land initiated another internal affairs
investigation of McInnis and Filush stemming from an incident in
which their patrol car got stuck in loose gravel at a private
home while the officers were investigating a burglar alarm.
See Def. Ex. TT at 3036. A retired Weston police officer helped
tow the patrol car and, in the course of towing, caused
approximately $500 of damage to the car. Ferullo recommended
that McInnis receive a formal letter of reprimand for violating a
rule against careless handling of department property. Id. at
3038. After meeting with McInnis, Land issued an oral reprimand
instead. Id. at 3042.

McInnis states that Officer Brodacki, who is age 27, see Pl.
Ex. 2, was not disciplined when he drove his patrol car over a
boulder that he had been sent out to investigate after a citizen

complaint, although Broadacki's accident also caused vehicle damage.  McInnis Dep. at 30-31.  Land did not dispute that Brodacki caused damage to his car, and that an internal affairs investigation was not conducted.  Land Dep. at 197.  He reasoned that McInnis's accident "was stupid" but "[t]here's a difference" with Brodacki.  Id.

McInnis states that while Land initiated several internal affairs investigations against him for various alleged derelictions of duty, Land did not investigate or discipline Daubert when Daubert responded to the scene of an attempted suicide but failed to discover for nearly an hour that the victim was still alive, thereby delaying medical treatment.  McInnis Dep. at 44-46; Land Dep. at 195-96.  Land's explanation for why he did not initiate an investigation was: "[I]t's not earth-shattering.  It wouldn't be the first cop that ever missed whether somebody was dead or alive."  Land Dep. at 196.  Land acknowledged "joking about it" with Ferullo and stated that he found the suicide incident "amusing."  Id.  McInnis argues that this explanation is not credible and supports his allegation of retaliation by Land.  Pl. L.R. 56(a)(2) Stmt. ¶ 46.

Defendants now move for summary judgment, arguing that McInnis has not established a prima facie case of age discrimination, and that even if he has, he cannot prove that defendants' articulated reasons for their decisions were

15

pretextual and that the defendants were motivated by
discriminatory intent.  Defendants further argue that the
plaintiff has failed to state an equal protection claim and that
Land is entitled to qualified immunity.

## II.   STANDARD

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with affidavits ... show that there is no genuine issue
as to any material fact and that the moving party is entitled to
a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party
seeking summary judgment "bears the burden of establishing that
no genuine issue of material fact exists and that the undisputed
facts establish [its] right to judgment as a matter of law."
Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir.
1995) (citation omitted).  "The duty of the court is to determine
whether there are issues to be tried; in making that
determination, the court is to draw all factual inferences in
favor of the party against whom summary judgment is sought,
viewing the factual assertions in materials such as affidavits,
exhibits, and depositions in the light most favorable to the
party opposing the motion."  Id. (citations omitted).  "If
reasonable minds could differ as to the import of the evidence
... and if there is any evidence in the record from any source
from which a reasonable inference in the nonmoving party's favor

16

may be drawn, the moving party simply cannot obtain [] summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations, alterations and quotations omitted).

## III. DISCUSSION

The ADEA prohibits employers from discriminating in hiring, firing, or setting the "compensation, terms, conditions, or privileges of employment" based on age.  29 U.S.C. § 623(a)(1). It protects individuals who are at least 40 years old.  Id. § 631(a)(1).  "Claims under the ADEA ... receive the same analysis as claims under Title VII." Raskin v. Wyatt Co., 125 F.3d 55, 60 (2d Cir. 1997); see also Smith v. City of Jackson, __ U.S. __, 125 S. Ct. 1536, 1541 (2005).

### A.   Burden Shifting Framework

This employment discrimination case is governed by the familiar McDonnell Douglas/Burdine burden-shifting framework. Under that framework, McInnis first must establish a prima facie case of discrimination on account of age. "In order to establish a prima facie case of age discrimination in violation of the ADEA, an employee must show 1) that he was within the protected age group, 2) that he was qualified for the position at issue, 3) that he suffered an adverse employment decision," Raskin, 125 F.3d at 63-64, and 4) that the adverse action occurred under "circumstances giving rise to an inference of discrimination."

17

Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001).
"The burden of establishing a prima facie case is not onerous."
Raskin, 125 F.3d at 64.

    "Once an ADEA plaintiff has established a prima facie case,
the burden shifts to the employer to articulate a legitimate,
non-discriminatory reason for the adverse employment decision."
Id. at 64 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,
507 (1993)).  "This burden is one of production, not persuasion;
it can involve no credibility assessment." Reeves v. Sanderson
Plumbing, 530 U.S. 133, 142 (2000) (internal citations,
quotations, and alterations omitted).  The defendant's burden is
satisfied if the proffered evidence "taken as true, would permit
the conclusion that there was a nondiscriminatory reason for the
adverse action." Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir.
2000)(quoting St. Mary's Honor Ctr., 509 U.S. at 509).

    "Once the defendant proffers a legitimate, non-
discriminatory reason, a plaintiff resisting summary judgment
must raise a genuine issue of material fact concerning whether
the employer's proffered reason was pretextual and whether the
true reason for the adverse employment decision was more likely
than not the illegal discrimination alleged by the plaintiff."
Raskin, 125 F.3d at 64 (citing Scaria v. Rubin, 117 F.3d 652, 654
(2d Cir. 1997) (per curiam)).  The proper inquiry for the Court
at this stage is "whether the proffered admissible evidence shows

circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.  It is not the province of the summary judgment court itself to decide what inferences should be drawn."  <u>Chambers v. TRM Copy Centers Corp</u>. 43 F.3d 29, 37 (2d Cir. 1994).

### 1.   Prima Facie Case

Defendants claim they are entitled to summary judgment because plaintiff cannot make out a prima facia case in two respects: qualification for the job and inference of discrimination.[7]  For the following reasons, defendants' claim for summary judgment on these grounds fails.

Defendants argue that McInnis was not qualified for the position because he did not score among the top three candidates.  This argument ignores a central part of McInnis's case: that Land manipulated the oral portion of the exam to disadvantage the older applicants and to favor the younger ones, and therefore McInnis's and Daubert's total scores did not objectively reflect their relative qualifications.  Defendants offer no evidence, other than the contested oral exam score, that McInnis was not qualified for the position of sergeant.  On the written portion of the test, McInnis earned the second-highest score, and he had 16 years experience on the Weston police force.

---

[7]It is undisputed that McInnis was over age 40 at the time he was denied promotion to the rank of sergeant, and that this denial constituted an adverse employment action.

Plaintiff's evidence demonstrates the existence of genuine issues of material fact concerning whether the scoring of the oral exam was affected by Land's alleged age bias.  Plaintiff has put forth evidence that Land hand-picked the panelists; created a new "Staff/Support Sergeant" position, for which Daubert had particularized experience, but did not tell the applicants that they were interviewing specifically for this position; told the panelists in advance to think of technical questions geared toward this position; reviewed their questions the morning of the exam; observed the exam in person for the first time ever; and assisted the panelists in calibrating the scores after the fact.  Further, plaintiff has presented an affidavit from a former Weston police sergeant, Roy Hill, who had served on similar oral exam panels, suggesting that Land previously had manipulated the promotional process to favor a younger applicant.[8]  In addition,

---

[8]Defendants move to strike Hill's affidavit from the summary judgment record.  See Def. Mot. to Strike [doc. # 58].  Contrary to defendants' argument, Hill's report of Land's alleged comment about wanting to "build his own department," Hill Aff. ¶ 6, in the context of this case, could be interpreted to reflect bias against older officers, and thus is relevant to Land's intent. Hill's testimony estimating the age of Bruce Turner, his competitor for promotion to sergeant in 1990, id. ¶ 5, is admissible based on personal knowledge because Hill and Turner had worked together for at least 16 years in the Weston Police Department.  Defendants do not challenge the admissibility of Hill's statement that Land in the past had tried to influence the scores awarded by oral exam panelists, id. ¶ 10, which is the only other evidence from Hill's affidavit on which the Court has relied in this Ruling.  For these reasons, defendants' motion to strike will be denied in part.

The motion will be granted as to Hill's allegations made

drawing all inferences in plaintiff's favor, the facts of the large disparities between Daubert's written and oral exam scores, and between his oral exam score and those of the other applicants, all of whom were over 40, could support the inference that the oral exam was manipulated to advantage Daubert, who was under 40.  "One cannot overlook the fact that at the heart of plaintiff's case is [his] charge that the evaluation scheme was itself biased and thus should not be used as a way to disprove [his] qualification for the job."  Hurd v. JCB Int'l Credit Card Co., 923 F. Supp. 492, 501 (S.D.N.Y. 1996); see also Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (fact that plaintiff was not on "best qualified list" for promotion insufficient for employer to prevail on motion for summary judgment where plaintiff raised issue of material fact whether the person who compiled the list relied on the race of the candidates, which was noted on the list).

Defendants argue that McInnis cannot make out the fourth prong of the prima facie case because he cannot show "circumstances giving rise to an inference of discrimination" because of the insignificant age differential between Daubert and

---

"upon information and belief"--and not based on personal knowledge--in paragraph 5 ("upon information and belief, Land requested the police commission to select me instead of Turner") and the second paragraph 7 ("upon information and belief, the police department at Westport would not allow Daubert to finish out his probationary period.").

McInnis.   See Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 316 (2d Cir. 1999).   In O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996), the Supreme Court held that the proper burden for the prima facie case is whether the plaintiff has presented "evidence adequate to create an inference that an employment decision" was based on age.   Id. at 313 (internal quotation marks and citation omitted).   "In the age-discrimination context, ... an inference [of discrimination] cannot be drawn from the replacement of one worker with another worker insignificantly younger."   Id.   The "reliable indicator of age discrimination" was held to be "the fact that a replacement is substantially younger than the plaintiff."   Id.

O'Connor did not set a bright line rule for the age difference that could be considered "substantial," and district courts have held differences "of more than ten years to be sufficient and those of fewer than five years to be insufficient."   See McNulty v. N.Y. City Dept. of Finance, 45 F. Supp. 2d 296, 299 n.3 (S.D.N.Y. 1999) (collecting cases).   In the context of this case, including plaintiff's evidence concerning allegedly age-biased comments made by Land and Land's allegedly disparate enforcement of disciplinary rules based on age, the six year difference between McInnis and Daubert does not negate the inference of discrimination provided by his direct evidence of bias.

22

2.  **Pretext**

Defendants offer as a legitimate non-discriminatory reason for promoting Daubert over McInnis that Daubert obtained the highest overall score on the sergeant's examination, including the highest score on the oral portion of the examination. See Def. Mem. of Law at 17.  In response, plaintiff has come forward with evidence that defendants' proffered reason is pretextual because of Land's involvement in the oral examination process, from which, as discussed above, a reasonable trier of fact could find that Land manipulated the results of the oral examination in favor of Daubert and to the detriment of McInnis. Plaintiff also has offered other circumstantial evidence that his denial of a promotion was motivated by age bias.  Former Police Commissioner Louis Goldberg testified that on August 1, 2002 -- the month of the sergeant exam -- Land stated in front of some members of the Board of Police Commissioners that the way to have good morale in the department would be to "get rid of the old guys and hire young ones," Goldberg Aff. at ¶ 5, Goldberg Dep. at 74, and in the early 1990s Land contrasted "the old guys" and the "the young Turks."[9]  Goldberg Dep. at 93.  Harper and Mendoza

---

[9]Defendants' argument that the "young Turks" comment is time-barred as outside the 300-day filing period of Title VII also is without merit.  Plaintiff offers this evidence not as a separately actionable discriminatory comment, but as circumstantial evidence of Land's state of mind at a later time when he allegedly manipulated the promotional process to enable Daubert to obtain the Sergeant's position.

testified that Land referred to older officers in the police
department as "dinosaurs."  Harper Aff. ¶ 3; Mendoza Dep. at 12.
Land's own deposition testimony characterized the younger
officers, but not the older ones, in age-stereotyped terms as
"energetic, hard-working and young."  Land Dep. at 240-241.

Defendants argue that the "get rid of the old guys and hire
young ones" remark is analogous to "out with the old and in with
the new," which has been rejected by two other courts as
insufficient to establish a prima facie case of age
discrimination.  See Vogel v. Travelers Ins. Co., 35 F.3d 558,
1994 WL 474871 at *3 (4th Cir. 1994) (unpublished); Welch v.
First Albany Corp., No. 97-CV-0861, 1999 WL 1069525 at *1
(N.D.N.Y. 1999) (unpublished summary order).  A stated preference
for "new" employees, however, is materially different from a
stated preference for "young ones."  While "new" is not
necessarily age-related, a reasonable trier of fact reasonably
could consider a statement than an employer preferred "young" to
"old" employees to be age-related.  Although Land denies making
this comment and has provided testimony of others present at the
Police Commission meeting who deny hearing it, whether he made
this comment remains disputed.  The evidence in the record of
Land's statement is sufficient to allow a factfinder to infer
that Land harbored age bias and that such bias motivated his

actions in connection with the promotional exam.[10]

Defendants also argue that Land's alleged comments about the "young Turks" and wanting to "get rid of the old guys and hire young ones" are "merely stray remarks without probative value." Def. Mem. of Law at 20.  "In determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative 'stray remark,' a court should consider the following factors: (1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process." Schreiber v. Worldco, LLC, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004) (citations omitted).

Plaintiff has presented evidence from which a reasonable factfinder could infer that although the Police Commission--as to which no discriminatory intent is attributed--made the ultimate decision to promote Daubert over McInnis, Land had influence over

---

[10]Defendants' argument that Land's August 1, 2002, comment cannot constitute evidence of discrimination because the comment "has no temporal proximity" to the decision not to promote McInnis is unpersuasive.  See Def. Mem. of Law at 8.  The cases defendants cite indicate that temporal proximity is an element of a retaliation claim, not a discrimination claim.

that decisionmaking process, advised the Police Commission on the promotional decision, coordinated the substance and procedure for oral exam, and favored the younger candidate, Daubert.  As Police Chief, a causal nexus can be inferred between Land's alleged comments and the result of the promotional process.  Land claims that his comment related to hazing in the police department, but Goldberg interpreted it to reflect age bias.  While a reasonable factfinder could credit either interpretation, plaintiff has presented sufficient evidence for a reasonable jury to find that Land's comment was not merely a stray remark but indicative that discrimination at least in part motivated Land's actions.

For these reasons, defendants' motion for summary judgment on the issues of the prima facie case and discriminatory intent must be denied.

### C.   Retaliation

Defendants also move for summary judgment on McInnis's claim that defendants retaliated against him for writing a letter to Land stating that he was contemplating bringing an age discrimination lawsuit.  Retaliation claims are addressed under the McDonnell/Douglas burden-shifting framework.  Terry, 336 F.3d at 141.  "[T]he elements of a retaliation claim ... are (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken

26

against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 148 (2d Cir. 2002).

Defendants "concede[] that the plaintiff was engaged in protected activity when on November 7, 2002 he informed Chief Land that he was considering filing a lawsuit for age discrimination." Def. Mem. of Law at 23. They contend, however, "that there is no evidence of a causal connection between the plaintiff's November 7, 2002 letter and any subsequent discipline imposed on the plaintiff," id., and that plaintiff did not suffer any adverse employment action as a result of the allegedly retaliatory actions.

Plaintiff claims that his evidence shows that Land initiated a series of internal affairs investigations into his conduct, beginning on November 7, 2002 and continuing throughout 2003, while other officers, including Daubert, were not investigated for similar or more egregious mistakes. Plaintiff's evidence shows that he did not actually suffer any adverse action until July 2003. The November 7, 2002 investigation into McInnis's handling of a motor vehicle accident ended after Land concluded that McInnis had done nothing wrong. Likewise, Land did not impose any discipline after investigating the strip search incident, and Land's decision in June 2003 to suspend McInnis for three days following his complaint about Daubert's failure to

provide backup was reversed by the Police Commission.  It was only in July 2003, eight months after threatening to sue and seven months after filing his CHRO complaint, that McInnis received a three-day suspension for making a false complaint against Daubert and Troxell.  Later that same month he received an oral reprimand for allowing his patrol car to be damaged.

Although he argues that the internal affairs investigations themselves were retaliatory, plaintiff offers no authority for the proposition that the initiation of an investigation, without more, is itself an adverse employment action.  The Second Circuit has held that "[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand" as well as transfer to a less desirable location or assignment.  Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999).  Other circuits are in agreement.  See Peltier v. United States, 388 F.3d 984, 988 (6th Cir. 2004); Jones v. Fitzgerald, 285 F.3d 705, 715 (8th Cir. 2002); Breaux v. City of Garland, 205 F.3d 150, 157 (5th Cir. 2000); see also Radolf v. Univ. of Conn., __F. Supp. 2d__, No. 3:03CV242 (MRK), 2005 WL 736459 at *17 (D. Conn. March 30, 2005).  Thus the internal affairs investigations directed at McInnis before June 2003 cannot, in themselves, be found to violate the ADEA's proscription on retaliation.

Defendants acknowledge that the discipline imposed on McInnis in July 2003 was an adverse employment action, but argue

28

that it was too remote in time from the initiation of McInnis's
CHRO complaint to constitute circumstantial evidence of
retaliation.  In order to prove a causal connection based on
temporal proximity <u>alone</u>, the time between the protected activity
and the adverse employment action must be "very close."  <u>Clark
County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273-74 (2001); <u>Davis
v. State Univ. of N.Y.</u>, 802 F.2d 638, 642 (2d Cir. 1986)
(protected activity must be "closely followed by adverse
actions," and one-month period was sufficient to make out a prima
facie case of retaliation.)

In this case, McInnis demonstrates more than mere temporal
proximity as a causal connection between his letter in November
2002 and the discipline in the summer of 2003; he offers evidence
from which it could reasonably be inferred that he was subject to
discipline when similarly-situated officers who had not filed
discrimination complaints were not treated in the same manner.
For example, Land acknowledged that while McInnis was orally
reprimanded for getting his patrol car stuck in gravel, Officer
Brodacki was not investigated or reprimanded for running over a
rock in the road and damaging a patrol car.  While McInnis and
Filush were investigated for failure to follow protocol during a
strip search, Daubert was not investigated for failing to
discover that a suicide victim, whom he was sent to check, was
still alive and in need of medical attention, or for pepper-

spraying a detainee in a police department holding cell, allegedly in violation of protocol.  A jury reasonably could find that the discipline to which plaintiff was subjected was the culimination of a series of internal investigations that began on the very day McInnis threatened an age discrimination lawsuit, linking McInnis's November 7 letter and the discipline throughout the seven month time frame.  Although McInnis was not disciplined directly as a result of the earlier internal affairs investigations, and although those investigations standing alone do not give rise to legally cognizable retaliation claims, a reasonable jury could find that Land initiated a series of internal affairs investigations against McInnis in an effort to find something for which to discipline him, and then disciplined him more harshly than officers who engaged in equivalent conduct. Thus, while the time lapse certainly weakens the nexus, in the context of all the evidence it cannot be concluded that no reasonable jury could infer a causal connection between the July 2003 discipline and the November 2002 age discrimination complaint.

Therefore defendant is not entitled to summary judgment on plaintiff's ADEA claims (Counts One and Three) or plaintiff's CFEPA claims (Counts Two and Four), which proceed under the same analysis.  See Craine v. Trinity College, 259 Conn. 625, 637 n.6, 791 A.2d 518, 531 (2002); Levy v. CHRO, 236 Conn. 96, 103, 671

A.2d 349, 355 (1996).

**D.   Equal Protection**

Count Five of plaintiff's complaint alleges that "Defendant Land, under the color of state law, deprived Plaintiff of equal protection of the law by treating him differently because of his age," in violation of the Equal Protection clause of the Fourteenth Amendment and 42 U.S.C. § 1983.[11]  Compl. ¶ 38.  This claim purports to be asserted "as to Land in his individual and official capacities."  Id.  An equal protection claim is not asserted against the Town of Weston.  Id.

Land was served with McInnis's complaint only in his official capacity.[12]  A Section 1983 suit against a municipal officer in his official capacity is considered a suit against the

_____

[11]"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress... ." 42 U.S.C. § 1983.

[12]The summons issued to Land [Doc. # 5] does not specify whether it is directed to him in his individual or official capacity, but it indicates that Land was served at the same address as the Town of Weston, see Summons [Doc. # 6], and the return of service recites: "left copies thereof with and in the hands of: Tom Landry Town Administrator of the Town of Weston who accepted service for: Anthony Land, Police Chief of the Town of Weston... ."  To be properly served in his individual capacity, Land would have had to have been personally served in-hand or at his usual place of abode.  Fed. R. Civ. P. 4(e); Conn. Gen. Stat. § 52-57(a).  Thus the Court concludes that Land has been served only in his official capacity.

31

municipality itself, <u>Brandon v. Holt</u>, 469 U.S. 464, 472 (1985), and therefore the officer may be held liable only if the municipality is liable for a "policy" or "custom" of unconstitutional discrimination under the principles of <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658, 690-91 (1978).  <u>Brandon</u>, 469 U.S. at 472-73.

McInnis has not alleged in his complaint, argued in his opposition brief, or adduced any evidence that the Town of Weston itself had a policy of age discrimination.  Therefore his Section 1983 claim against Land in his official capacity must fail.

## IV.  CONCLUSION

Accordingly, defendants' motion for summary judgment [doc. # 49] is DENIED IN PART as to plaintiff's ADEA and CFEPA claims (Counts One through Four) and GRANTED IN PART as to plaintiff's Equal Protection claim (Count Five).  Defendants' motion to strike [doc. # 58] is GRANTED IN PART and DENIED IN PART.


IT IS SO ORDERED.

_____/s/_____
JANET BOND ARTERTON
United States District Judge

**Dated at New Haven, Connecticut, this 28th day of June, 2005.**