UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DANN MCINNIS,                          :
          PLAINTIFF,                   :
                                       :
V.                                     :     Civil No. 3:03CV1803(JBA)
                                       :
TOWN OF WESTON AND                     :
ANTHONY LAND,                          :
          DEFENDANTS                   :

RULING ON POST-TRIAL MOTIONS

On October 14, 2005, a jury returned a verdict finding that plaintiff Dann McInnis ("McInnis"), a police officer employed by the Town of Weston, had been retaliated against for making an age discrimination complaint to Weston Police Chief Anthony Land ("Land"), and awarding $4,200 in economic damages, $4,200 in liquidated damages for wilfulness, and $960,000 in compensatory damages, reduced by $100,000 for failure to mitigate.[1] See Verdict Form [Doc. # 120].  Defendants have moved for relief from judgment, judgment as a matter of law, a new trial, or remittitur.  Plaintiff opposes these motions and seeks attorney fees and costs.  For the reasons that follow, defendants' motion for a new trial will be granted unless plaintiff accepts a remittitur of $710,000 of the non-economic damages award, and accepts non-economic damages of $150,000.  Defendants' other motions will be denied.  Plaintiff's motions for costs and

_____

[1]The jury found that plaintiff had not met his burden of proving age discrimination.  See Verdict Form [Doc. # 120].

1

attorney fees will be granted in part and denied in part.

**I.   Motions for Relief from Judgment and Judgment as a Matter of Law [Docs. ## 125, 132]**

  **A.   Standard**

Defendant moves for relief from judgment pursuant to Rule 60(b) and also renews its motion for judgment as a matter of law under Rule 50(b), on the grounds that the jury's verdict on whether McInnis proved an adverse employment action was inconsistent, and the evidence did not support the conclusion that McInnis suffered such action.

Judgment as a matter of law may be rendered only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue...." Fed. R. Civ. P. 50(a)(1).  A renewed Rule 50(b) motion will be granted "only if the evidence, drawing all inferences in favor of the non-moving party and giving deference to all credibility determinations of the jury, is insufficient to permit a reasonable juror to find in h[is] favor." <u>Lavin-McEleney v. Marist College</u>, 239 F.3d 476, 479 (2d Cir. 2001).  Thus, "judgment as a matter of law should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]."  <u>Id.</u> at 480 (quoting <u>DiSanto v.</u>

2

McGraw-Hill, Inc., 220 F.3d 61, 64 (2d Cir. 2000) (per curiam)).
A movant under Rule 50 "faces a high bar." Id. at 479.

Rule 60(b) provides that a court may relieve a party from a
final judgment for one of six reasons: "(1) mistake,
inadvertence, surprise, or excusable neglect; (2) newly
discovered evidence...; (3) fraud...; (4) the judgment is void;
(5) the judgment has been satisfied...; or (6) any other reason
justifying relief from the operation of the judgment." Fed. R.
Civ. P. 60(b). "A motion for relief from judgment is generally
not favored and is properly granted only upon a showing of
exceptional circumstances. The burden of proof is on the party
seeking relief from judgment...." United States v. Int'l Bhd. of
Teamsters, 247 F.3d 370, 391 (2d Cir. 2001) (internal citations
omitted). Defendants have not specified on which subsection of
Rule 60(b) they predicate their motion, and they have not argued
mistake by the parties, newly discovered evidence, fraud, or
satisfaction of the judgment. "A judgment is void under Rule
60(b)(4) of the Federal Rules of Civil Procedure only if the
court that rendered it lacked jurisdiction of the subject matter,
or of the parties, or if it acted in a manner inconsistent with
due process of law." Grace v. Bank Leumi Trust Co. of N.Y., 443
F.3d 180, 193 (2d Cir. 2006) (internal citation and quotation
marks omitted). Defendants do not argue that the Court lacked
jurisdiction or violated principles of due process. Thus the

only remaining ground for relief would be Rule 60(b)(6), the catchall provision.

**B.   Consistency of Jury's Verdict**

In both their Rule 50 and Rule 60 motions, defendants argue that the jury found that McInnis had not been subjected to an adverse employment action, and therefore plaintiff failed to prove an essential element of the retaliation claim on which the jury found in his favor.  Because the jury's verdict can be interpreted consistently with its other findings and the evidence, the Court finds no basis for setting it aside.

Two separate claims were submitted to the jury: age discrimination and retaliation.  The verdict form separated the two claims into separate sections on two separate pages. See Verdict Form [Doc. # 120].  Under "Age Discrimination," the jury was asked, "Do you find that the plaintiff, Dann McInnis, has proved that he was subjected to adverse employment action by the defendant, Town of Weston?"  The jury checked "No," and therefore also checked "No" for the second question, whether the Town of Weston discriminated against plaintiff on the basis of age.  On the next page, under the heading "Retaliation," the jury was asked whether McInnis "reasonably believed in good faith he had been subjected to age discrimination by the defendant when he made his complaints of age discrimination," which the jury answered, "Yes," and then they also answered "Yes," to the

4

question whether "plaintiff has proved by a preponderance of the evidence that the defendant, the Town of Weston, retaliated against him because he complained of age discrimination."

The jury was instructed that to find in favor of plaintiff on the retaliation claim, they would be required to find that he suffered an adverse employment action:

> To prove a claim for retaliation, Mr. McInnis must prove each of the following elements:
> (1) That he was engaged in statutorily-protected activity.  To establish participation in protected activity, Mr. McInnis need only show that he was acting under a good faith, reasonable belief that the defendant's actions violated the law against age discrimination.
> (2) That the alleged retaliator, Chief Anthony Land, knew that Mr. McInnis had complained about illegal age discrimination.
> (3) That an adverse decision or course of action (as defined on page 1[8]) was taken against Mr. McInnis.
> (4) That a causal connection exists between the protected activity and the adverse action.

See Jury Instructions [Doc. # 117] at 18, 23.[2]

---

[2]The charge on adverse employment actions read:

To prove that he was subjected to an adverse employment action, Mr. McInnis must prove that he experienced a materially adverse change in the terms, conditions or privileges of his employment.  To be "adverse," an employment action must involve the deprivation of some tangible term, condition or privilege of employment.  A change is "material" if it is of such quality or quantity that a reasonable employee would find the conditions of his or her employment altered for the worse.  A materially adverse change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.  Whether action constitutes a materially adverse change depends on consideration of all the evidence and the

While the jury was not asked again about adverse employment action as a separate interrogatory under the retaliation claim, the jurors were clearly instructed that an adverse employment action is an element of such a claim.

Contrary to defendants' argument, it was not inherently inconsistent for the jury to find that McInnis did not suffer an adverse employment action in connection with the claimed age discrimination but that he did suffer an adverse employment action later during the course of defendants' retaliation.  These two claims related to different periods of time.  Plaintiff's age discrimination claim centered around various age-biased comments made by Land over a period of years since the 1990s; Land's disparate treatment of other older officers in the police department, including disparate imposition of discipline; as well as fellow officer Daubert's refusal to provide - and Land's refusal to insure - adequate backup.[3]  Plaintiff's evidence of

context of this particular police officer's situation. Jury Instructions at 18.

[3]As discussed in this Court's summary judgment ruling, plaintiff originally claimed that he suffered an adverse employment action related to age because he was passed over for promotion from Patrolman to Sergeant.  See McInnis v. Town of Weston, 375 F. Supp. 2d 70, 81-82 (D. Conn. 2005).  Plaintiff dropped his promotion claim shortly before trial.  Am. Compl. [Doc. # 76].  Defendant then moved to dismiss the age discrimination claim for lack of an adverse employment action [Doc. # 96], which motion plaintiff answered by asserting that the totality of all defendants' actions amounted to an adverse employment action by making McInnis's job more difficult [Doc. #

retaliation, however, centered on the time period after November 7, 2002, when McInnis wrote to Land that he felt he had been discriminated against based on his age, leading to the series of Internal Affairs investigations which culminated in two suspensions of McInnis in June and July 2003.  Therefore, the jury consistently could have concluded that plaintiff suffered no adverse employment action before November 2002, but did suffer one after that date.

In their September 30, 2005 motion for judgment as a matter of law (filed shortly before trial and after plaintiff amended his complaint to delete his failure-to-promote claim), defendants took the position that plaintiff would not be able to prove he suffered an adverse employment action because of his age, but "concede[d] that both suspensions [in June and July 2003] constitute adverse employment actions" that were connected with plaintiff's retaliation claim.  Def. Mem. in Support of Mot. to Dismiss/Mot. for Judgment as Matter of Law [Doc. # 96-2] at 3, n. 2.  Defendants also conceded as much in their earlier summary judgment briefing.  See McInnis v. Town of Weston, 375 F. Supp. 2d 70, 85 (D. Conn. 2005).  Their proposed verdict form acknowledged that the suspensions constituted adverse employment actions, and suggested asking the jury only whether the

---

104].  It was unnecessary for the Court to rule on defendant's motion to dismiss Count One, as the jury found no liability on that count.

suspensions were imposed "because of" plaintiff's complaints of age discrimination.  See Def. Proposed Jury Instructions [Doc. # 98] at 13.  In his closing argument, defendants' attorney argued that plaintiff had not put forth evidence that an adverse employment action was taken against McInnis because of age, but he did not make the same argument with regard to the retaliation count.  See Trial Transcript ("Tr.") at 1266-67, 1269.  Thus, before and during trial, defendants never challenged the sufficiency of plaintiff's adverse employment action evidence with respect to the retaliation claim and they acknowledged that the two suspensions in 2003, which plaintiff claimed were retaliatory, were adverse employment actions.  They raised the sufficiency of plaintiff's adverse employment action evidence only with respect to the age discrimination claim, which centered on different factual allegations.  For this reason the Court did not present the jury with a separate special interrogatory concerning their findings of an adverse employment action on the section of the verdict form pertaining to the retaliation count.

    In addition, the Second Circuit has long held that a suspension without pay, for which a plaintiff receives no backpay, is an adverse employment action sufficient for a retaliation claim.  See, e.g., Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999) ("Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay,

and reprimand.") (emphasis supplied).  The Town contends that the jury necessarily found that plaintiff's suspension between July 8 and July 17, 2003 did not amount to an adverse employment action because they failed to award the $920 in economic damages that plaintiff requested for the suspension.  However, it was clearly the jury's prerogative to decide what amount of economic damages plaintiff proved.  The jury's failure to award economic damages for the suspensions may have been an oversight given the small amount, but whatever the explanation for the damages award, it is undisputed that plaintiff's suspension without pay was an adverse employment action.  Moreover, defendants had numerous opportunities -- including their proposed verdict form and jury charge and the charge conference -- to clarify their position or request an additional special interrogatory on the verdict form, but they did not do so.  Therefore the Court rejects defendants' argument that the jury's verdict is inconsistent or incomplete, and their Rule 50(b) and 60(b) motions on this basis are denied.

## C.  Sufficiency of Evidence of Retaliation

The legal landscape concerning employment retaliation claims has been considerably clarified by Burlington Northern Railway v. White, __ U.S. __, 126 S. Ct. 2405, 2414-15 (2006), which held that a plaintiff asserting a Title VII retaliation claim is not limited to showing only the adverse employment action required for substantive Title VII claims, but rather "must show that a

reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (internal citations and quotation marks omitted).  In other words, "the anti-retaliation provision [of Title VII], unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."  Id. at 2412-13.  Thus, the Supreme Court held that White's reassignment to dirtier, less prestigious and less desirable duties, which were still within her job description and paid the same, could constitute retaliation.  Id. at 2416-17. Likewise, her 37-day suspension also could constitute retaliation because "an indefinite suspension without pay could well act as a deterrent [to filing a Title VII charge], even if the suspended employee eventually received backpay."  Id. at 2417.

Like Title VII, the ADEA includes a substantive provision that prohibits injury to persons based on their status, and an anti-retaliation provision that prohibits harms based on individuals' conduct.  See White, 126 S. Ct. at 2412 (setting out the two-fold logic of Title VII).  Moreover, courts generally apply the same standards with respect to Title VII and ADEA retaliation claims, and the Supreme Court's reasoning concerning the statutory language of Title VII, see White, 126 S. Ct. at 2412-13, should thus apply equally to the ADEA, which, like Title

VII, utilizes the phrase "compensation, terms, conditions, or privileges of employment," in connection with the substantive provision, but utilizes a different phrase ("discriminate against") in connection with the anti-retaliation provision. See 29 U.S.C. § 623 (a), (d). By extension, the Supreme Court's reasoning that Congress' objective of preventing employers from interfering through retaliation with an employee's efforts to obtain statutory protections was broader in the anti-retaliation provision than the substantive provision, applies equally to ADEA and Title VII. White, 126 S. Ct. at 2412 (stating "that the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment"). Therefore White should govern McInnis's retaliation claim.

Defendants' argument that McInnis failed to prove an "adverse employment action" implicates too high a proof standard under White. Rather, the inquiry should be whether McInnis presented sufficient evidence for a jury to find that defendants' actions "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415.

The evidence at trial showed that after November 7, 2002, the date that McInnis wrote a letter to Chief Land containing his belief that he was being discriminated against on the basis of age, plaintiff was subjected to repeated internal affairs ("IA")

investigations for lesser offenses, culminating in two
suspensions without pay (one of which was eventually overturned
by the Board of Police Commissioners) in Summer 2003.  The
evidence further showed that McInnis was investigated and
reprimanded for conduct that was similar to or of no greater
severity than that of younger officers who were not reprimanded.
While McInnis was orally reprimanded for getting his patrol car
stuck in gravel, Officer Brodacki was not investigated or
reprimanded for running over a rock in the road, damaging his
patrol car.  While McInnis and his partner, Officer Filush, were
investigated for failure to follow protocol during a strip
search, Sgt. Daubert was not investigated for failing to discover
that a suicide victim, whom he was sent to check, was still alive
and in need of medical attention, or for pepper-spraying a
detainee in a police department holding cell in violation of
protocol.[4]

The jury in this case was charged, prior to White, that
plaintiff's burden was to show a material adverse employment
action, and the jury found that plaintiff had met this burden.
Thus, the evidence on which the jury based its verdict was
sufficient as a matter of law to conclude that plaintiff met the

---

[4]The evidence of McInnis's investigations and reprimands was
clearly relevant to the issue of defendants' retaliatory intent,
and the Court rejects defendants' argument that the evidence was
admitted improperly at trial.

lesser burden of showing that the challenged actions were
materially adverse such that a reasonable employee could well
have been dissuaded from filing or pursuing an ADEA action.  The
pattern of departmental investigations into his professional
competence, resulting from some seemingly minor infractions,
could reasonably be found to be materially adverse to the career
of a police officer.  McInnis testified that he felt that his
supervisors were continuously on his back, looking to find
something wrong, because they needed to document "progressive
discipline" in order to eventually fire him.  Needless to say,
this caused serious anxiety on his part.  After the first
investigation, McInnis received an oral reprimand, which was the
first step in the progressive discipline ladder.  While the next
investigations yielded no discipline, after McInnis complained
that Sgt. Daubert had failed to arrive as backup and had instead
secretly changed the duty schedule, plaintiff was suspended twice
without pay.  Suspension is the intermediate step in the
progressive discipline process leading to termination.  Under
these circumstances, it would be reasonable for an employee to
feel persecuted, and to believe that the employer was building a
case to fire him for apparently trivial misdeeds.  Given the
potential career consequences, the jury could have found that
these circumstances would be likely to deter a reasonable
employee from making a complaint.

Regardless, as discussed above, defendants had conceded throughout the litigation of this case that McInnis's suspensions constituted adverse employment actions.  It cannot be disputed that plaintiff's suspension without pay was an adverse employment action, which is clearly unchanged by <u>White</u>.  Accordingly, defendants' renewed motion for judgment as a matter of law is denied.[5]

## II.  Motion for New Trial or Remittitur [Doc. # 127]

Alternatively, defendant moves for a new trial or remittitur, arguing that the jury's $860,000 non-economic damages award "shocks the sense of justice" and must be reduced.  Non-economic compensatory damages are not available under the federal Age Discrimination in Employment Act, so the jury's award pertains exclusively to plaintiff's Connecticut Fair Employment Practices Act ("CFEPA") claim, and Connecticut law determines whether the jury's award is excessive.  See <u>Gagne v. Town of</u>

---

[5]For the same reasons, the Court disagrees with defendants' contention that they are entitled to judgment as a matter of law under the reasoning of <u>Phillips v. Bowen</u>, 278 F.3d 103, 108 (2d Cir. 2002).  <u>Phillips</u> involved First Amendment retaliation and the plaintiff in <u>Phillips</u> could not show a "classic" adverse employment action such as "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, [or] reprimand...."  <u>Id.</u> at 109.  By contrast, McInnis was in fact suspended without pay as well as partnered in a way that reduced his pay due to loss of the shift differential.  Not only are these "classic" "reduction in pay" adverse employment actions, under <u>White</u> a suspension without pay, as the culmination of defendants' ongoing investigations attempting to find something for which to discipline McInnis, is clearly a material action that could deter a reasonable employee from pursuing a discrimination complaint.

Enfield, 734 F.2d 902, 905 (2d Cir. 1984); Schanzer v. United

Techs. Corp., 120 F. Supp. 2d 200 (D. Conn. 2000).

> Under Connecticut law: 'The size of the verdict alone
> does not determine whether it is excessive.  The only
> practical test to apply is whether the award falls
> somewhere within the necessarily uncertain limits of
> just damages or whether the size of the verdict so
> shocks the sense of justice as to compel the conclusion
> that the jury was influenced by partiality, prejudice,
> mistake or corruption.'

Bracey v. Bd. of Educ. of City of Bridgeport, 368 F.3d 108, 117–

18 (2d Cir. 2004) (quoting Gaudio v. Griffin Health Servs. Corp.,

249 Conn. 523, 551, 733 A.2d 197, 214 (1999)).  The Court views

the evidence concerning damages "in the light most favorable to

the plaintiff, ... determining whether the verdict returned was

reasonably supported thereby."  Schanzer, 120 F. Supp. 2d at 217.

The Court must be able to "find an evidentiary basis in the

record" for the jury's award, Bracey, 368 F. 3d at 119, and

"[d]amages are recoverable only to the extent that the evidence

affords a sufficient basis for estimating their amount in money

with reasonable certainty."  Gaudio, 249 Conn. at 554.

    In this case, plaintiff testified credibly that his

experience at work was extremely unpleasant, stressful and

fraught with uncertainty.  Because of Daubert's threat to refuse

to provide backup if plaintiff were in danger (which was

corroborated by dispatcher Mendoza (Tr. 111)), McInnis

continually feared for his safety.  He stated he was "constantly

worried, fearful, scared.  I'm a six foot guy, 220 pounds, and it

15

scares me that I'm not going to have the backup that I need."
(Tr. 350).  He began refusing overtime assignments because he
could not face more time at work, and now "take[s] every
advantage not to be there."  (Tr. 350).  He feels as if he is
"persona non grata" in the police department, because some of the
younger officers refuse to be partnered with him and refuse to
socialize with him.  (Tr. 357).  He also testified to feeling
inadequate because his depression has created "tension" and
"problems" at home.  (Tr. 358).  He had eight sessions with a
counselor, Dr. Patricia Cook, to whom he was referred through his
employee assistance program.  (Tr. 345-46).  Plaintiff's wife
testified that while he used to adore his job he no longer feels
that way.  She stated "[t]here was no spark left [in him after
2002], and I feel I've lost my best friend."  (Tr. 934).  He
became depressed and withdrawn, and no longer was involved in
coaching or attending his children's softball games or spending
evenings with the family.  (Tr. 931-32).  She also observed that
beginning in 2002 plaintiff had difficulty sleeping and only
slept 3-4 hours per night.  (Tr. 929).

The deposition of Dr. Cook, plaintiff's psychologist, was
read at trial.  She testified that McInnis came to her primarily
due to distress related to his work, and she saw him 8 times
between January and April 2003 to discuss work-related issues as
well as other stressors, including his wife's diagnosis with

multiple sclerosis and raising his teenage children.  She
believed that "[a]s time went on... he was calmer about the
situation....  He became somewhat less focussed [sic] on the job
issue and more attentive to other aspects of his life that should
be and are important to him as well."  (Tr. 1193).  While she
believed further treatment "might have been helpful," "it wasn't
essential."  (Tr. 1195).

On review of Connecticut caselaw, the Court concludes that
the jury's award of $860,000 for non-economic damages based on
this record is clearly excessive and indeed shocks the Court's
sense of justice.  "In determining the proper amount of a
compensatory damages award..., courts have looked to a number of
factors, including: whether plaintiff submitted evidence
regarding the duration, severity, and consequences of the
emotional harm suffered."  Schanzer, 120 F. Supp. 2d at 218.  In
Schanzer, for example, in 2000, this Court remitted to $40,000
and $45,000, respectively, the non-economic damages awarded to
plaintiffs whom the jury found were wilfully discriminated
against due to their age when they were laid off from their jobs,
in violation of the CFEPA.  Id. at 217-19.  The plaintiffs
"testified credibly to their feelings of hurt, shock,
disorientation, embarrassment and the distress they suffered at
the loss of their careers after such a lengthy tenure..."  Id. at
217.  However, neither of the plaintiffs ever had "any physical

17

manifestations," nor did they seek counseling, and the evidence "show[ed] neither extreme trauma nor permanent injury."  Id. at 218.  In Buckman v. People Express, Inc., 205 Conn. 166, 530 A.2d 596 (Conn. 1987), the court remitted an earlier $50,000 emotional distress award to $35,000 where plaintiff "became withdrawn, very depressed, unable to eat or sleep, upset and teary, and felt inadequate and irresponsible as a husband and father" because he was unable to secure continuation of his medical insurance.  Both plaintiff and his wife had serious medical problems, known to the defendant.  However, plaintiff did not suffer "permanent injury," and therefore the jury's award was held to be excessive.  Id. at 176.

Cases meriting larger non-economic damages awards are those in which plaintiffs suffered more than "garden variety" signs of emotional distress, often including physical symptoms; and their testimony was corroborated by other witnesses.  Gaudio v. Griffin Health Servs. Corp., 249 Conn. 523, 551, 733 A.2d 197, 214 (1999); Oakes v. New England Dairies, Inc., 219 Conn. 1, 5-6, 591 A.2d 1261, 1264 (1991); Howell v. New Haven Bd. of Educ., 3:02cv736 (JBA), 2005 WL 2179582, at *8-10 (D. Conn. Sept. 8, 2005).  In Gaudio, 249 Conn. at 551, for example, the Connecticut Supreme Court upheld a jury's award of $100,000 in non-economic damages to a plaintiff who "was emotionally devastated" after being wrongfully terminated and defamed by his employer in 1990.

He became depressed, "a romantic relationship terminated, and the plaintiff lost a substantial amount of weight." Id.  The plaintiff in Oakes, 219 Conn. at 5-6, was terminated in 1985 in retaliation for utilizing workers' compensation benefits, and testified that after his termination he had "stomach pains" and "passed out on two occasions," and was prescribed valium for depression.  He undertook a four-year job search but was unable to find a position with equivalent pay.  The Connecticut Supreme Court held that "[g]iven the plaintiff's age, the emotional and physical effects of his discharge and his endurance of a prolonged period of uncertainty as to his future financial security," the jury's award of $97,500 in non-economic damages was not excessive.  219 Conn. at 15.  In Howell, 2005 WL 2179582, at *8-10, an ADA case, this Court, while noting the amount was "at the upper end of that reasonably supported by the trial evidence," upheld an award of $200,000 in non-economic damages to a plaintiff who was punitively transferred from a teaching position in a highly desirable, specialized school to another job at a regular school for significantly less pay, and was uniquely susceptible to emotional distress due to underlying serious depression, for which he took medication.

Here plaintiff's emotional distress was sufficiently serious for him to seek counseling, and produced somatic manifestations,

including observable sleep impairment and social withdrawal.[6]

Although plaintiff perceived an age discriminatory atmosphere in his department, the jury disagreed and found no illegal age discrimination on which the damages award could be based. Plaintiff's evidence included no proof of permanency of injury nor any pre-existing condition disposing plaintiff to exceptional severity of emotional injury.  However, as a police officer, plaintiff's professional identity and job satisfaction derived from the power, authority and respect accorded him, and Chief Land's actions, particularly the series of IA investigations, disciplinary reprimands and suspensions were all designed to humiliate plaintiff and make him feel powerless.  Plaintiff described his workplace as a "living hell," causing him to forego available overtime opportunities, but he continued in the Weston Police Department, necessarily shading somewhat his extreme characterization.[7]  Although plaintiff did not suffer career consequences as serious as layoff, termination, or transfer with a significant loss of pay, McInnis reasonably believed he was in

---

[6]Dr. Cook, however, did not testify to any specific diagnosis, and she believed that further treatment could be beneficial but was not necessary.  She never recommended plaintiff see a psychiatrist to obtain medication.

[7]Thus, the circumstances of this case presented no applicability of a "constructive discharge" theory of liability for a "working environment... so intolerable that [] resignation qualifie[s] as a fitting response," Pa. State Police v. Suders, 542 U.S. 129, 134 (2004).

Land's crosshairs for eventual firing, and felt he was being
dragged through the progressive discipline procedure to that end.
McInnis had cast his lot with the Weston Police Department, but
the threat to his tenure there hung like a Sword of Damocles over
his head, for reasons beyond his responsibility or control.  The
Court agrees with McInnis' argument that he should be compensated
additionally for his emotional distress resulting from Daubert's
threats to not back up plaintiff, and Land's support of Daubert,
which he felt placed his life in jeopardy.  While Daubert was not
the only officer available to provide plaintiff with back up,
McInnis testified about prior failures on Daubert's part and his
concern if he were to be without backup in a dangerous situation.
The jury properly considered the emotional toll of this
uncertainty and fear for his safety during this extended period,
particularly because of the range and frequency of uncertain,
risky situations a patrolman may encounter.

However, even considering to the fullest extent the nature
and duration of plaintiff's emotional distress, including fear of
firing, risk of no backup, loss of enjoyment of his job, and
professional and personal humiliation, the jury's $860,000 award
cannot be supported by the trial evidence.  In closing argument,
plaintiff's counsel argued that the jury could use plaintiff's
retirement income projection ($960,000) as a measure of
compensatory damages to "give him the ability to get out of that

hell" (Tr. 1262).  This use of an economic loss which never occurred to measure compensation for non-economic damages he sustained while remaining on the job was misleading, since plaintiff intended to stay there.  Although the jury had been instructed that compensatory damages could be awarded for "emotional distress, mental anguish, suffering, humiliation, inconvenience, loss of enjoyment of life, and other non-monetary losses...," Jury Instructions at 29, given the gist of plaintiff's closing argument, the Court thought it necessary to issue a supplemental instruction on this subject in hopes of dispelling the misleading nature of the argument:

> During summation, you heard reference to future pension benefits.  Generally, pension benefits constitute front pay, which is not requested here as economic damages.  However, you may use any tool to assess the value of emotional distress.
>
> In considering damages, if you find liability, you should consider:
>  1)  Economic damages, which is the value of Mr. McInnis' lost wages; and
>  2)  Compensatory damages, which is the value of Mr. McInnis' emotional distress.

Additional Instruction [Doc. # 118].  Given the absolute identity between the figure requested to substitute for McInnis's pension, $960,000 (Tr. 1263), and the amount awarded, $960,000 (before mitigation reduction), it is evident that the Court's instruction was insufficient to alert the jury that using the future pension value to enable him to leave the department as a measure of emotional distress sustained while he was there was improper and

22

unrelated to the conditions and circumstances of plaintiff's employment in the Weston Police Department.  The result of this improper apparent conflation was a shockingly disproportionate non-economic damages award, in contrast to an economic loss award of only $4200.

The Court finds that based on the evidence in this case any compensatory non-economic damages of more than $150,000 would be excessive.  Accordingly, defendant's motion for new trial will be granted unless plaintiff accepts a remittitur of the non-economic damages award to $150,000 within 30 days.

## III. Motion for Attorney Fees and Costs [Docs. ## 130, 131, 153]

Plaintiff moves for attorney fees in the total amount of $284,256.25, and costs in the amount of $5,078.  Defendants object to various aspects of these motions.  Their objections will be sustained in part and overruled in part, as detailed below.

### A.    Prevailing Rates

Plaintiff seeks compensation at the rate of $375/hour for Attorney de Toledo, $275/hour for each of her three associates, and $85/hour for her paralegal.  Defendant argues that these rates are excessive, and suggests that the appropriate rates are $250/hour for Attorney de Toledo, $135-150/hour for the associates, and $50/hour for the paralegal.

The Court finds that Attorney de Toledo's rate of $375 is

reasonable compared to prevailing rates for attorneys of her experience in Fairfield County, Connecticut.  She states in her affidavit that she has worked in the area of employment discrimination law since 1976, and was admitted to the Connecticut bar in 1981.  She is a co-founder of the Connecticut Employment Lawyers Association, and she is known to have achieved many substantial verdicts for her clients in this state.  She has submitted affidavits from three colleagues, all experienced Connecticut employment litigators, attesting to the quality of her work and the reasonableness of the $375/hour rate.  In 2002, this Court found that she should be compensated $325/hour, the rate she then billed, for work on a complex ERISA case.  Dobson v. Hartford Fin. Servs. Group, Inc., No. 3:99CV2256 (JBA), 2002 WL 31094894, at *3 (D. Conn. Aug. 2, 2002).  The Court has recently approved awards of $300/hour for experienced civil rights litigators in the New Haven area, see, e.g., Arlio v. Lively, 392 F. Supp. 2d 317, 325 (D. Conn. 2005); Howell v. New Haven Bd. of Educ., 3:02cv736 (JBA), 2005 WL 2179582, at *11 (D. Conn. Sept. 8, 2005).  The Court recognizes, however, that attorneys in Fairfield County incur higher overhead costs due to their "close proximity to New York."  Omnipoint Communs., Inc. v. Planning & Zoning Comm'n., 91 F. Supp. 2d 497 (D. Conn. 2000) (awarding partners rates of $250-300/hour for legal work in 1999).  Furthermore, the result she obtained in this case,

although reduced today on defendants' motion, shows Attorney de Toledo's considerable skill and ability as an employment litigator.  Therefore the Court approves her rate of $375/hour.

The Court finds, however, that the requested rates for the three associates are not reasonable, and reduces their rate to $200/hour.  Attorney Pirrotti, who participated in the trial, had been practicing 13 years, but nearly all of her prior experience was in criminal law.  In fact, the trial in this case was delayed by one month to correspond with Attorney Perrotti's start date at Attorney de Toledo's firm, so she could second-chair.  Attorney Burke (since resigned) had been in practice 15 years, though only two years with Attorney de Toledo's firm, and his experience is described only generally as having "represented many plaintiffs and defendants in employment law cases over the past 15 years." De Toledo Aff. ¶ 11(b).  Attorney Rogol (since resigned) was in practice 24 years part-time, but only about 2.5 years with Attorney de Toledo's firm, and her prior experience is "mainly in the areas of civil litigation and appellate law, and ... legal consulting services."  Id. at ¶ 11(c).

The affidavits in support of plaintiff's motion attest only in conclusory fashion to the reasonableness of $275/hour for these attorneys, without any reference to the prevailing rates for mid-level associates in civil rights firms in southern Connecticut, or at the affiants' own firms.  There appears to be

25

a great deal of variation in the case law awarding associate attorneys fees.  In Omnipoint, 91 F. Supp. 2d at 499, Judge Eginton approved rates ranging from $100-200/hour for associates working on a § 1983 case in approximately 1999-2000.  In Blackledge v. Carlone, 126 F. Supp. 2d 224, 233 (D. Conn. 2001), Judge Hall awarded fees of $200/hour for an attorney with eight years of general experience, rather than the requested rate of $250/hour.  In Tsombanidis v. City of West Haven, 208 F. Supp. 2d 263, 276 (D. Conn. 2002), Judge Goettel reduced the rate for an associate with nine years of experience to $165/hour, from the requested $205/hour, due in part to the fact that she actually billed the client at the lower rate.  Based on these precedents, the Court concludes in this case that $200/hour is reasonable for the three associates of Attorney de Toledo, each of whom worked on the case only briefly and, in Attorney Pirrotti's case, arrived at the firm - her first job in the field of employment law - mere weeks before trial.

The Court concludes that $70/hour is a reasonable rate for paralegal time in this case.  Plaintiff has provided no affidavits or other evidence in support of the requested $85 rate.  Courts in this district have awarded a broad range, between $50 and $95/hour, for paralegal time over the last few years.  See DIRECTV, Inc. v. Neznak, 371 F. Supp. 2d 130 (D. Conn. 2005) (awarding $90/hour in 2005); Tsombanidis, 208 F.

26

Supp. 2d at 277 ($50/hour for paralegal time in 2001); <u>Cabrera v.</u>
<u>G.T. Constr.</u>, No. 3:05CV812 (MRK) (WIG), 2006 WL 1328767, at *1
(D. Conn. May 8, 2006) ($60/hour to law students as equivalent to
prevailing paralegal rates in 2006); <u>Charter Communs. Enter. I,</u>
<u>LLC v. Terzigni</u>, No. 3:06CV41 (PCD), 2006 WL 1168595, at *3 (D.
Conn. Apr. 27, 2006) ($85/hour for paralegal time in 2005 and
$95/hour in 2006).  The record is silent on Ms. Rothman's
background and experience.  Thus the Court declines to award
$85/hour but sets $70/hour as a reasonable prevailing rate for a
paralegal's time in Connecticut, absent distinguishing
circumstances.

**B.   Hours Billed**

Defendants argue that plaintiff's counsel spent "excessive
time" preparing this case, and duplicated efforts as several
associates cycled through Attorney de Toledo's firm and were
required to get up to speed on the case.  The Court sees no
evidence of duplicated tasks in the billing records, however.
Defendants' argument that counsel spent excessive time preparing
for Chief Land's deposition is also rejected; given that he was
the primary defendant and key player in this case, 45.1 hours of
Attorney de Toledo's time, attendance of Attorney Burke along
with Attorney de Toledo at the deposition, and assistance of Ms.
Rothman in digesting the deposition, do not appear unreasonable.

The Court also disagrees with defendants' contention that

all or most of Attorney Pirrotti's trial preparation and trial
work should be refused as duplicative.  Defendants had two
attorneys at counsel table throughout the pretrial and trial
proceedings of this case.  Jury selection, trial and
deliberations extended for seven days and included approximately
76 exhibits [Doc. # 122] and 16 witnesses [Doc. # 121].  While
not exceptional, the scope of the trial warranted a second-chair
for plaintiff, as it did for defendants.

Defendants argue that travel time should not be compensated,
or if it is, should be compensated at 50% the attorney's usual
rate.  Courts in this district tend to award 100% compensation of
travel time for trial, especially if counsel work on the case
while traveling and if counsel obtain a successful outcome.  See
Gonzalez v. Town of Stratford 830 F. Supp. 111, 115 (D. Conn.
1992) (reimbursing travel at usual hourly rate because counsel
worked on case while traveling, and because attorneys incur "an
opportunity cost that is equal to the fee [they] would have
charged that or another client if [they] had not been
traveling.") (internal citation and quotation marks omitted);
Rose v. Heintz, 671 F. Supp. 901, 905 (D. Conn. 1987)
(compensating some travel time at 50% usual rate, but allowing
100% of another's time due to few hours claimed and results
achieved); Broadnax v. City of New Haven, No. 3:98CV807 (WWE),
3:02CV123 (WWE), 2004 WL 491079, at *1 (D. Conn. Mar. 3, 2004)

(awarding 12 hours' travel time to and from trial) ("Attorney travel time may be billed at 100% of the hourly rate when the hours are few, and the representation is able and successful."). Here, Attorney de Toledo states she and Attorney Pirrotti worked on the trial while driving to and from Stamford.  The requested travel to and from settlement conferences and depositions is minimal.  Obviously they achieved a successful result for their client.  Therefore the Court will compensate the requested travel time at the attorneys' allowed hourly rates.

Finally, defendants object to three hours billed by Attorney Burke for attendance at the deposition of Dr. Michael Sonick, plaintiff's dentist, who had been noticed as an expert but did not testify at trial and, according to defendants, "did not have any expert medical opinions regarding the plaintiff."  Def. Opposition [Doc. # 147] at 10.  Defendants argue that because they "already had to pay for Dr. Sonick's time and defense counsel fees for his deposition," id., they should not have to pay plaintiffs' attorney fees as well.  Defendants misunderstand the purpose of the fee shifting statutes, however, which is to avoid burdening plaintiffs with civil rights claims with the cost of litigation even if they win.  The issue therefore is whether certain fees would have properly been billed to the plaintiff, not whether defendants also incurred expenses for the same deposition.  While plaintiff's counsel should have prepared Dr.

29

Skolnik's testimony and known in advance that he did not have any opinion to render, it was defendants who noticed the deposition, and once they decided to take the deposition, plaintiff is entitled to his attorney's fees for attending.

### C.   Costs

Plaintiff requests reimbursement of costs for the filing fee, service of process, depositions, trial copying, and trial subpoenas, in the total amount of $5,078.13.   See Am. Pl. Mot. for Taxable Costs [Doc. # 153]; Bill of Costs [Doc. #130]. Defendants first object to the motion on the ground that plaintiff has not submitted receipts to document these costs. The only requirement, however, is that the requesting attorney verify the costs by affidavit, which has been done by Attorney de Toledo.   See 28 U.S.C. § 1924 ("Before any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed.").   Although the Court would consider it more useful to review supporting documentation, neither the statute, nor Fed. R. Civ. P. 54, nor D. Conn. L. Civ. R. 54, actually requires it.

Defendants also object to the deposition expenses for Peter

30

Ottomano and Stephen McNally, witnesses who did not testify at trial.  Defendants argue that the deposition of Ottomano, a former chair of the Weston Police Commission, was available from another case, yet plaintiff unnecessarily chose to depose him again, and that McNally, a former Sergeant with the Weston Police Department who turned out to have little useful information, also did not need to be deposed.  Plaintiff argues that the testimony of these witnesses was directly relevant to the issue of Chief Land's treatment of older officers in the Weston Police Department, see Reply Br. [Doc. # 142] at 1.

Deposition expenses are taxable if they are "necessarily obtained for the preparation of the case and not for the convenience of counsel."  D. Conn. L. Civ. R. 54(c)(2)(ii).  It does not appear that the deposition expenses for Ottomano and McNally were incurred merely for the convenience of counsel. Defendants, not plaintiffs, noticed and took McNally's deposition.  Once defendants took the deposition, it would be reasonably necessary for plaintiffs to obtain a copy of the transcript.  While Ottomano was previously deposed in the Filush case, defendants had resisted producing the Filush evidence due to a protective order in that case, and, regardless, plaintiff utilized Ottoman's deposition in his successful opposition to the defendants' summary judgment motion.  See Pl. Opp. [Doc. # 54-4], Ex. 9.

31

Defendants object to plaintiff's request for the cost of copying exhibits for the trial and the pretrial conference. Copies are taxable if "necessarily obtained for use in the case." D. Conn. L. Civ. R. 54(c)(3).  Because the Court requests attorneys to provide tabbed bench books for the Court's use at the pretrial conference and at trial, plaintiff's request for these copies is granted.  As it is also this Court's recommendation that counsel provide jurors with exhibit books for their use during trial, plaintiff's request for such copying expenses is granted as well.  <u>Arlio</u>, 392 F. Supp. 2d at 325. Finally, plaintiff has not requested reimbursement of costs for routine in-house photocopies (listed on the attorney fee itemization) during the case and therefore defendants' objection to these costs is moot.

Accordingly, the plaintiff is awarded costs in the requested amount of $5,078.13, and attorney fees in the amount of $255,452.50,[8] for a total of $260,530.63.

**IV. Motion for Stay [Doc. # 126]**

Shortly after trial in this case defendants moved for a stay of proceedings to enforce the judgment, pending resolution of the motions for judgment as a matter of law and for a new trial.

---

[8]Attorney de Toledo's time (475.04 hours * $375/hour) + Attorney Pirrotti's time (231.8 hours * $200/hour) + Attorney Burke's time (129.7 hours * $200/hour) + Attorney Rogol's time (19.2 hours * $200/hour) + Ms. Rothman's time (16.75 hours * $70/hour) = $255,452.50.

Plaintiff did not oppose the motion for a stay, but now that defendants' post-trial motions have been acted on, their motion for a stay is moot and is denied.

**V.  Conclusion**

For the foregoing reasons, Defendants' Motions for Relief from Judgment and Judgment as a Matter of Law [Docs. ## 125, 132] are DENIED; Defendants' Motion for New Trial or Remittitur [Doc. # 127] is GRANTED IN PART and plaintiff is directed to file with the Court within 21 days of the date of this ruling a statement either accepting entry of a modified judgment in the amount of $158,400 ($4,200 economic damages + $4,200 liquidated damages + $150,000 non-economic damages), or opting for a new trial; Plaintiff's Motions for Attorney Fees and Costs [Docs. ## 130, 131, 153] are GRANTED IN PART in the total amount of $260,530.63; Defendant's Motion for a Stay [Doc. # 126] is DENIED AS MOOT.

IT IS SO ORDERED.

/s/

_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 1st day of September, 2006.**